**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge William J. Martínez**

Criminal Case No. 20-cr-036-WJM

UNITED STATES OF AMERICA,

Plaintiff,

v.

1. JORGE DE LA ROSA-CALDERON,
2. EMILIO JOSIAH DEHERRERA,
3. JANINE JANELLE DEHERRERA,
4. ALEXZANDER BLAIER, and
5. **WESLEY PAPPAS**,

Defendants.

---

## ORDER DENYING WESLEY PAPPAS'S MOTION FOR A *FRANKS* HEARING AND DENYING MOTION TO DISMISS COUNT 3

---

The Government charges Defendant Wesley Pappas with one count of conspiracy to distribute and possess with intent to distribute controlled substances, in violation of 21 U.S.C. § 846; one count of possession with intent to distribute 50 grams or more of a mixture and substance containing a detectable amount of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B)(viii); one count of possession with intent to distribute a mixture and substance containing a detectable amount of cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C); and one count of possession with intent to distribute 28 grams or more of a mixture and substance containing a detectable amount of cocaine base (crack cocaine), in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B)(iii). (*See* ECF No. 38.)

Before the Court is Pappas's Motion for a *Franks* Hearing and to Suppress

Evidence ("*Franks* Motion"), filed on June 5, 2020. (ECF No. 80.) Also before the Court is Pappas's Motion to Dismiss Count 3 ("Motion to Dismiss"), filed on August 24, 2020. (ECF No. 124.)

The Court finds that no hearing is needed to resolve these motions. For the reasons explained below, the Court denies both motions.

## I. *FRANKS* MOTION

In the *Franks* Motion, Pappas seeks to suppress evidence seized on February 5, 2020 pursuant to a search warrant. (ECF No. 80.)

### A. Burden of Proof

"Generally, if the search or seizure was pursuant to a warrant, the defendant has the burden of [proving that the Government violated the Fourth Amendment]." *United States v. Carhee*, 27 F.3d 1493, 1496 (10th Cir. 1994) (internal quotation marks omitted). Pappas offers no argument why the general rule does not apply, nor is the Court aware of one. Accordingly, Pappas bears the burden here.

### B. Deferential Review of Warrants & *Franks* Challenges

The Court's duty

> is to ensure that the magistrate judge had a substantial basis for concluding that the affidavit in support of the warrant established probable cause. The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit there is a fair probability that contraband or evidence of a crime will be found in a particular place.
>
> Because of the strong preference for searches conducted pursuant to a warrant, the Supreme Court has instructed [lower courts] to pay great deference to a magistrate judge's determination of probable cause. Only the probability, and not a prima facie showing, of criminal activity is the standard

> of probable cause. The test is whether the facts presented in the affidavit would warrant a [person] of reasonable caution to believe that evidence of a crime will be found at the place to be searched.

*United States v. Nolan*, 199 F.3d 1180, 1182–83 (10th Cir. 1999) (internal quotation marks and citations omitted; some alterations incorporated). "The Fourth Amendment requires probable cause to persist from the issuance of a search warrant to its execution." *United States v. Dalton*, 918 F.3d 1117, 1127 (10th Cir. 2019). In the event that probable cause ceases to exist after a warrant is issued, "the warrant will no longer directly support the ensuing search." *Id.*

A defendant who wishes a reviewing court to consider evidence outside what the warrant-issuing court considered must bring a *Franks* challenge, named for *Franks v. Delaware*, 438 U.S. 154 (1978). *Franks* held that a defendant may be entitled to a preliminary evidentiary hearing to challenge the truthfulness of statements in an affidavit sworn in support of a warrant. *Id*. at 155–56. To obtain a *Franks* hearing, the defendant must make "a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit." *Id*. at 155–56; *see also United States v. Owens*, 882 F.2d 1493, 1499 (10th Cir. 1989) ("It is not enough to show . . . that an affiant's negligence or innocent mistake resulted in false statements in the affidavit."). The defendant must also make a substantial preliminary showing that "the affidavit, purged of its falsities, would not be sufficient to support a finding of probable cause." *United States v. Kennedy*, 131 F.3d 1371, 1376 (10th Cir. 1997).

To demonstrate recklessness, evidence must exist that the officer "entertained

serious doubts as to the truth of his allegations . . . and [a] reasonable factfinder may infer reckless disregard from circumstances evincing obvious reasons to doubt the veracity of the allegations." *Beard v. City of Northglenn, Colo.*, 24 F.3d 110, 116 (10th Cir. 1994). "[T]he standards of deliberate falsehood and reckless disregard set forth in *Franks* apply to material omissions, as well as affirmative falsehoods." *Id*. (internal quotation marks omitted).

The Court's task, whether on the face of the pleadings or on the facts as established after a *Franks* hearing, is to reconstruct the warrant as it should have been and then decide whether probable cause existed:

> If an arrest warrant affidavit contains false statements, the existence of probable cause is determined by setting aside the false information and reviewing the remaining contents of the affidavit. Where information has been omitted from an affidavit, we determine the existence of probable cause by examining the affidavit as if the omitted information had been included and inquiring if the affidavit would still have given rise to probable cause for the warrant.

*Taylor v. Meacham*, 82 F.3d 1556, 1562 (10th Cir. 1996) (internal quotation marks and citation omitted). If a district court determines the opponent of the search warrant has proven his case by a preponderance of evidence at the hearing, then the district court must suppress the evidence obtained pursuant to the warrant. *United States v. McKissick*, 204 F.3d 1282, 1297 (10th Cir. 2000).

**C. The Search Warrant**

On February 5, 2020, Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") Special Agent Travis Johnson applied for a warrant to search two residences, including the apartment residence of Pappas at 3460 S. Lincoln Street, Englewood,

Colorado (the "Property"). (ECF No. 80-1 at 3.) Among other things, Agent Johnson made the following representations in the search warrant application:

- Between the dates of June 6, 2019 and January 3, 2020, ATF undercover agents ("UCs") purchased illegal narcotics and firearms from Jorge DE LA ROSA-CALDERON and Emilio DEHERRERA ["E. DeHerrera"]. (*Id.* at 12 ¶ 8.)

- On January 3, 2020 DE LA ROSA-CALDERON, [JANINE DEHERRERA ("J. DeHerrera")] and E. DEHERRERA arrived at a predetermined location . . . and the UCs subsequently purchased four firearms, approximately 57 grams of crystal methamphetamine, approximately 4 grams of heroin and 89 pills of suspected oxycodone/fentanyl from DE LA ROSA-CALDERON. (*Id.* at 13 ¶ 14.)

- Within 45 minutes after departing the UC location, ATF [Special Agents] learned that DE LA ROSA-CALDERON's geolocation information was at [the Property] (within a 19 meter deviation). Based on your affiant's training and experience, your affiant believes DE LA ROSA-CALDERON sourced narcotics from [the Property]. Your affiant further believes that DE LA ROSA-CALDERON received the narcotics on consignment from [the Property] and returned to [the Property] after the UC purchase to drop of[f] the proceeds from the transaction. This belief is based on DE LA ROSA-CALDERON proceeding to [the Property] immediately after the January 3, 2020 transaction. Your affiant's training and experience has shown that . . . stash houses are also commonly used, whether to store a larger cache of firearms/narcotics and/or proceeds. The behavior exhibited by DE LA ROSA-CALDERON, J. DEHERRERA and E. DEHERRERA with [the Property] . . . is indicative that they use this location as a stash house. (*Id.* at 13–14 ¶ 15.)

- On January 7, 2020, a pole camera was placed in front of [the Property] with a view that shows individuals entering and exiting [the Property]. ATF [Special Agents] learned that between the dates of January 7, 2020 and February 3, 2020, DE LA ROSA-CALDERON, J. DEHERRERA and E. DEHERRERA entered [the Property] approximately fifteen (15) times, at all hours of the day, and for short periods of time. . . . ATF [Special Agents] further learned that DE LA ROSA-CALDERON, J. DEHERRERA and E. DEHERRERA

are together every time entering [the Property]. Specifically on January 13, 2020, at approximately 3:51 p.m., DE LA ROSA-CALDERON, J. DEHERRERA and E. DEHERRERA entered [the Property]. DE LA ROSA-CALDERON was carrying a black bag in his left hand upon entering [the Property]. Your affiant believes this to be the same black bag DE LA ROSA-CALDERON retrieved the narcotics from during the January 3, 2020 controlled purchase. At approximately 4:45 p.m., DE LA ROSA-CALDERON, J. DEHERRERA and E. DEHERRERA exited [the Property]. DE LA ROSA-CALDERON was carrying the black bag. (*Id.* at 14–15 ¶ 17.)

- On February 4, 2020, between 11:04 p.m. and 11:31 p.m., DE LA ROSA-CALDERON and an UC exchanged several messages. DE LA ROSA-CALDERON told the UC that he could get 5 pounds of methamphetamine and DE LA ROSA-CALDERON wanted to know if the UC wanted them so DE LA ROSA-CALDERON could get them tonight. The UC agreed to purchase the 5 pounds of methamphetamine from DE LA ROSA-CALDERON and the UC told DE LA ROSA-CALDERON to bring the 5 pounds of methamphetamine to the pre-arranged meeting on February 5, 2020. (*Id.* at 16 ¶ 19.)

- On February 5, 2020, at approximately 12:09 a.m., DE LA ROSA-CALDERON's geolocation information for [his] cell phone number . . . was in the vicinity of [the Property], indicative of his movement towards [the Property]. At approximately 12:11 a.m., visible on the pole camera, three people believed to be DE LA ROSA-CALDERON, J. DEHERRERA and E. DEHERRERA entered [the Property]. At 12:26 a.m., DE LA ROSA-CALDERON's geolocation information was at [the Property] (within a 16 meter deviation). At approximately 2:09 a.m., three people again believed to be DE LA ROSA-CALDERON, J. DEHERRERA and E. DEHERRERA exited [the Property] and departed the area. (*Id.* at 16 ¶ 20.)

- Based on their movements, as well as your affiant's training and experience, your affiant believes DE LA ROSA-CALDERON picked up the 5 pounds of methamphetamine from [the Property] and brought the methamphetamine to TARGET LOCATION 1 to store until the pre-arranged meet

with the UC later in the day on February 5, 2020. (*Id.* at 17 ¶ 21.)

The cross-referenced Attachment B sought authority to search for and seize the following:

- Controlled substances, including methamphetamine, heroin, fentanyl and cocaine.

- All firearms, firearm parts and other items relating to firearm possession.

- Any vessels or other implements used in connection with the production, packaging, weighing, storage, transport, or distribution of such firearms and controlled substances.

- Any substance used to mix into controlled substances in order to create a larger volume.

- Books, records, receipts, notes, ledgers, and other papers relating to the production, transportation, ordering, purchase or distribution of firearms and controlled substances.

- Books, records, invoices, receipts, records of real estate transactions, bank statements, and related records, certificates of deposits, passbooks, money drafts, letters of credit, money orders, bank drafts, cashier's checks, bank checks, correspondence, safe deposit keys, money wrappers, and other items evidencing the obtaining, secreting, transfer and/or concealment of assets and the obtaining, secreting, transfer, concealment and/or expenditure of money.

- Cellular telephones and other communications devices, which may only be searched for the following items: (i) assigned number and identifying telephone serial number, (ii) stored list of recent received and sent calls, (iii) stored contact information, (iv) stored photographs of controlled substances, suspected criminal activity and/or co-conspirators, and (v) stored text messages.

- Addressed and/or telephone books, indices, and any papers reflecting names, addresses, telephone numbers, pager numbers, fax numbers, and/or telex numbers of co-

conspirators, sources of supply, customers, financial institutions, and other individuals or businesses with whom a financial relationship exists.

- United States currency, precious metals, jewelry and financial instruments.

- Photographs and digital images of assets and/or firearms and controlled substances.

- Documents or other articles of personal property tending to indicate the ownership of and/or control over the [Property] including, purchase or lease agreements, keys, and mail envelopes.

(*Id.* at 4–5.)

United States Magistrate Judge Michael E. Hegarty approved the search warrant application at 3:07 p.m. on February 5, 2020. (*Id*. at 19.)

**D. Analysis**

Pappas contends that Agent Johnson falsely represented in his warrant affidavit that De La Rosa picked up five pounds of methamphetamine from the Property on February 5, 2020 when, in fact, De La Rosa was unable to obtain the methamphetamine. (ECF No. 80 at 3–4.) Pappas argues that Agent Johnson's statements regarding the February 5 methamphetamine pickup "are false and the affiant knew or should have known they were false when he presented his affidavit to the Magistrate Judge." (*Id.* at 4.) According to Pappas, "[h]ad the Magistrate Judge been made aware that there was no 5 pounds of methamphetamine at [the Property]" on February 5, "the affidavit then taken as a whole fails to establish probable cause to authorize the search." (*Id.* at 5.)

In response, the Government argues that Agent Johnson did not make any false or misleading statements in the search warrant application. (ECF No. 96 at 1, 3.) In particular, the Government contends that when Judge Hegarty authorized the search warrant at 3:07 p.m. on February 5, 2020, "the agents had every expectation that a five-pound methamphetamine transaction would occur later that day." (*Id.* at 3.) When Jorge De La Rosa-Calderon, E. DeHerrera, and J. DeHerrera arrived at the pre-determined location to conduct the methamphetamine transaction at 6:07 p.m., they informed the undercover agents—for the first time—that their methamphetamine source was unable to provide the methamphetamine prior to the transaction. (ECF No. 96 at 3; ECF No. 80-2 at 4.) However, they also informed the undercover agents that their source would be re-supplied that evening between 7:00 p.m. and 7:30 p.m. (ECF No. 96 at 3; ECF No. 80-2 at 4.)

The Court finds that Pappas has failed to make a preliminary showing that the search warrant application contained deliberate or recklessly false information or material omissions. *See Franks*, 438 U.S. at 155–56. The facts described in the search warrant application support Agent Johnson's belief that De La Rosa-Calderon had picked up five pounds of methamphetamine from the Property. (ECF No. 80-1 at 17 ¶ 21.) After all, on February 4, 2020, De La Rosa-Calderon had informed an undercover agent that he *could* obtain the five pounds of methamphetamine and suggested that he would pick up the methamphetamine that evening if the agent wanted it. (*Id.* at 16 ¶ 19.) That same evening, De La Rosa-Calderon, J. DeHerrera, and E. DeHerrera were seen entering the Property at 12:11 a.m. and leaving the Property approximately two hours later. (*Id.* at 16 ¶ 20.) Pappas has not provided any

facts suggesting that Agent Johnson's belief was not well-founded both when it was made and when Judge Hegarty signed the search warrant.[1]

Pappas argues for the first time in his reply that "existent probable cause changed significantly after the warrant was signed by [Judge Hegarty] and before it was executed." (ECF No. 104 at 5.) As an initial matter, Pappas has waived this argument by raising it for the first time in his reply. *See United States v. Harrell*, 642 F.3d 907, 918 (10th Cir. 2011) ("[A]rguments raised for the first time in a reply brief are generally deemed waived."). At any rate, the Court finds that the probable cause for the search warrant did not dissipate when the agents were informed that De La Rosa-Calderon was unable to obtain the methamphetamine prior to the February 5 transaction. After all, during the February 5 transaction, De La Rosa-Calderon informed the undercover agent that a re-supplier would arrive that evening between 7:00 p.m. and 7:30 p.m—*i.e.*, less than an hour after the meeting between De La Rosa-Calderon and the undercover agents. (ECF No. 80-2 at 4.)

Moreover, even if the Court ignored Agent Johnson's belief that De La Rosa-Calderon actually picked up five pounds of methamphetamine from the Property, there

---

[1] Agent Johnson's affidavit states that De La Rosa-Calderon was seen carrying a black bag during a prior narcotics transaction and when entering and exiting the Property. (ECF No. 80-1 at 14–15, ¶ 17.) Pappas speculates that Agent Johnson "knew that [De La Rosa-Calderon] had obtained no methamphetamine[ ] from [the Property]" because De La Rosa-Calderon was not carrying a black bag when he left the Property on February 5, 2020. (ECF No. 104 at 4.)

The Court is unwilling to conclude that Agent Johnson *must have known* that De La Rosa-Calderon was unable to obtain the methamphetamine because he did not have a black bag in his possession. Even if the absence of a black bag could have caused Agent Johnson to have some misgivings about De La Rosa-Calderon's ability to obtain the methamphetamine, such misgivings are outweighed by De La Rosa-Calderon's statement that he could obtain five pounds of methamphetamine, his suggestion he would pick up the methamphetamine that evening, and his midnight visit to the Property.

is still ample probable cause to believe that the Property is a stash house where De La Rosa-Calderon, J. DeHerrera and E. DeHerrera picked up narcotics and/or firearms.[2]

First, De La Rosa-Calderon visited the Property less than an hour after he sold undercover agents four firearms, approximately 57 grams of crystal methamphetamine, approximately 4 grams of heroin, and 89 pills of suspected oxycodone/fentanyl on January 3, 2020. (ECF No. 80-1 at 13 ¶ 14.) Agent Johnson represented that De La Rosa-Calderon's conduct was consistent with cases in which individuals receive narcotics on consignment and utilize stash houses to store larger amounts of narcotics.[3] (*Id.* at 13–14 ¶ 15.)

Second, the pole camera evidence demonstrates De La Rosa-Calderon, E. DeHerrera, and J. DeHerrera visited the Property approximately fifteen times between January 7, 2020 and February 3, 2020, at all hours of the day and for short periods of time. (*Id.* at 14–15 ¶ 17.)

---

[2] Pappas argues the search warrant application falls short of establishing probable cause because "no undercover agent or cooperating individual has ever been inside the home" and "there is no allegation or information of anyone living or working at the address aside from [De La Rosa-Calderon]." (ECF No. 104 at 3–4.) These statements, however, do not detract from the significant evidence suggesting that the Property operated as a stash house. Moreover, although Pappas repeatedly points out that Agent Johnson had only been a ATF Special Agent for 17 months at the time of the search warrant application (*Id.* at 3, 5), he offers no evidence suggesting that Agent Johnson lacks training or experience relevant to this investigation.

[3] Pappas contends that Agent Johnson's observation that De La Rosa-Calderon arrived at the Property approximately 45 minutes after his January 3, 2020 narcotics sale to the undercover agents does not support the notion that the Property is a stash house. (ECF No. 104 at 5.) According to Pappas, the Property is only a 15-minute drive from the location of the transaction. (*Id.*) He suggests that "[i]f one believes the agent's investigative theory, [De La Rosa-Calderon] must have gone to another location to pay someone for his consigned narcotics" prior to arriving at the Property. (*Id.*) The Court is not persuaded by Pappas's speculation given that De La Rosa-Calderon appeared at the Property *less than an hour* after his transaction with undercover agents.

Third, De La Rosa-Calderon carried the same black bag to and from the Property that he used to hold narcotics during his January 3, 2020 sale to undercover agents. (*Id.*)

Fourth, after De La Rosa-Calderon informed undercover agents that he could obtain five pounds of methamphetamine and wanted to pick up the narcotics that evening, he visited the Property in the middle of the night on the eve of the February 5, 2020 transaction and stayed at the location for less than two hours. (*Id.* at 16 ¶ 19.)

For the reasons set forth above, Pappas's *Franks* Motion is denied.

## II. MOTION TO DISMISS

Pappas's Motion to Dismiss requests that the Court dismiss Count Three of the superseding indictment (ECF No. 38), which charges Pappas, De La Rosa-Calderon, E. DeHerrera, and J. DeHerrera with violating 21 U.S.C. § 846 (attempt and conspiracy):

> From a time unknown but not later than December 2019, up to and including on or about February 5, 2020, in the State and District of Colorado and elsewhere, the defendants, JORGE DE LA ROSA-CALDERON, a/k/a "Gunny," EMILIO JOSIAH DEHERRERA, JANINE JANELLE DEHERRERA, WESLEY PAPPAS, and others both known and unknown to the Grand Jury, did knowingly and intentionally combine, conspire, confederate and agree, with interdependence, to distribute and possess with the intent to distribute one and more of the following controlled substances: (1) 50 grams and more of methamphetamine (actual), a schedule II controlled substance; (2) a mixture and substance containing a detectable amount of heroin, a schedule I controlled substance; (3) a mixture and substance containing a detectable amount of N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propenamide (fentanyl) in violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(A)(viii) and (b)(1)(C). All in violation of Title 21, United States Code, Section 846.

(*Id.* at 2.)

Pappas contends the charge is defective because "it fails to provide the defendants with adequate notice of the crimes alleged so as to allow [Pappas] to adequately prepare his defense." (ECF No. 124 at 2.) In particular, he argues: (1) "[t]he dates charged are vague and do not provide adequate notice to [Pappas] as to the approximate time the offices were allegedly committed"; and (2) the charge "is violative of the 5th Amendment to the United States Constitution as it is so vague as to deny [Pappas] the ability to identify the charge so as to plead if needed being twice placed in jeopardy for the same offense." (*Id.*) The Government contends that Count Three of the superseding indictment is legally sufficient. (ECF No. 146.)

The sufficiency of an indictment is determined by two criteria: (1) "whether the indictment contains the elements of the offense intended to be charged, and sufficiently apprises the defendant of what he must be prepared to meet"; and (2) "in case any other proceedings are taken against him for a similar offense[,] whether the record shows with accuracy to what extent he may plead a former acquittal or conviction." *United States v. Patterson*, 713 F.3d 1237, 1249 (10th Cir. 2013) (internal citations omitted). Sufficiency is determined by practical rather than technical considerations. *United States v. Dunn*, 841 F.2d 1026, 1029 (10th Cir. 1998).

In *Patterson*, the Tenth Circuit considered the sufficiency of an indictment containing cocaine and marijuana conspiracy charges which state that the conspiracy began on dates unknown to the grand jury and held that the indictment sufficiently notified the defendant of the charges against which he had to defend. *Id.* at 1249–50. The Tenth Circuit further found that the indictment and record provided that defendant "with sufficient protection from the risk that he will be placed in jeopardy a second time

for the same conduct for which he was convicted" given that the government had identified the members and goals of the conspiracies, the drugs distributed, the geographic scope, and the termination date of the conspiracy. *Id.* at 1250.

Other courts have likewise determined that indictments charging conspiracies that lack a definite start date are nonetheless legally sufficient. *See, e.g.*, *United States v. Forrester*, 616 F.3d 929, 940–41 (9th Cir. 2010) (determining that "although an indictment cannot be completely open-ended, an indictment that specifies an end date is sufficient to apprise defendants of the charges and enable them to prepare a defense" (internal citation omitted)); *United States v. Rawlins*, 606 F.3d 73, 78–79 (3d Cir. 2010) (holding conspiracy charge running "from a time unknown and continuing to September[ ] 2004" sufficiently informed defendant of the charges he would face at trial); *United States v. Hristov*, 466 F.3d 949, 954 (11th Cir. 2006) (recognizing in dicta the sufficiency of an indictment that charged a conspiracy running from "an unknown date through September 9, 2003"); *United States v. Pease*, 240 F.3d 938, 943 & n.4 (11th Cir. 2001) (upholding indictment alleging a conspiracy "[f]rom an unknown date through on or about July 21, 1998"); *United States v. Crosby*, 2018 WL 3244071, at *2–3 (D. Me. July 3, 2018) (determining indictment's conspiracy charge "[b]eginning on a date unknown, but not later than May 1, 2015, and continuing until a date unknown, but not earlier than January 25, 2016" is sufficient).

The Court finds that Count Three of the superseding indictment sets forth the elements of the offense charged, puts Pappas on fair notice of the charges against which he defends, and enables Pappas to assert a double jeopardy offense if he had been charged with the same offense previously. *See Patterson*, 713 F.3d at 1249.

Pappas is aware that the Government brings the conspiracy charge between De La Rosa-Calderon, E. DeHerrera, J. DeHerrera, and Pappas based on alleged distribution and possession with the intent to distribute methamphetamine, heroin, and fentanyl in the District of Colorado. Moreover, the charge alleges that the conduct took place at least between December 2019 and February 5, 2020.[4] *See Forrester*, 616 F.3d at 941 (recognizing that "uncertainty regarding a conspiracy's beginning and ending dates does not render an indictment fatally defective so long as overt acts alleged in the indictment adequately limit the time frame of the conspiracy").

Accordingly, the Court denies Pappas's Motion to Dismiss Count Three.

## III. CONCLUSION

For the reasons set forth above, Pappas's *Franks* Motion (ECF No. 80) is DENIED, and Pappas's Motion to Dismiss (ECF No. 124) is DENIED.

Dated this 16th day of October, 2020.

BY THE COURT:

______________________________
William J. Martínez
United States District Judge

---

[4] The indictment's other counts also identify three narcotics transactions conducted by Pappas's co-conspirators during the conspiracy time frame: a transaction on December 4, 2019, a transaction on January 3, 2020, and an attempted transaction on February 5, 2020. (ECF No. 38.)