**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge William J. Martínez**

Criminal Case No. 20-cr-036-WJM

UNITED STATES OF AMERICA,

      Plaintiff,

v.

1.    JORGE DE LA ROSA-CALDERON,
2.    EMILIO JOSIAH DEHERRERA,
3.    JANINE JANELLE DEHERRERA,
4.    ALEXZANDER BLAIR, and
**5.    WESLEY PAPPAS,**

      Defendants.

---

**ORDER GRANTING WESLEY PAPPAS'S MOTION TO SUPPRESS**

---

The Government charges Defendant Wesley Pappas with: (1) conspiracy to distribute and possess with intent to distribute controlled substances, in violation of 21 U.S.C. § 846; (2) possession with intent to distribute 50 grams or more of a mixture and substance containing a detectable amount of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A)(viii); (3) possession with intent to distribute a mixture and substance containing a detectable amount of cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C); and (4) possession with intent to distribute 28 grams or more of a mixture and substance containing a detectable amount of cocaine base (crack cocaine), in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B)(iii).  (ECF No. 38.)

Before the Court is Pappas's Motion to Suppress Evidence and Statement Obtained Subsequent to an Illegal Arrest ("Motion"), filed on June 5, 2020.  (ECF No.

82.)  The Court held an evidentiary hearing on December 7, 2020.  (ECF No. 180.)  For the reasons set forth herein, the Motion is granted.

## I.  FACTUAL FINDINGS

Based on the parties' filings and the documentary and testimonial evidence received at the evidentiary hearing, the Court makes the following findings of fact for purposes of resolving the Motion.[1]

### A.   Execution of the Search Warrant and Pappas's Arrest

On the evening of February 5, 2020, the Drug Enforcement Agency ("DEA") and local law enforcement officers were planning to execute a search warrant on Pappas's residence at 3460 South Lincoln St., Englewood, Colorado.  (ECF No. 92 at 2; Evidentiary Hearing Transcript ("Tr.") at 7, 13.)[2]  Prior to the execution of the search warrant, DEA Special Agent Shannon Moham was informed that Pappas is a felon.  (Tr. at 8.)

Agents observed Pappas and Christina Martinez leave Pappas's residence and drive away in a silver Toyota Sequoia (the "Toyota").  (Tr. at 10; ECF No. 82 at 1.)  At the time, Special Agent Moham stated on his radio that other law enforcement officers should follow the Toyota and, if they felt they had probable cause to conduct a stop of the vehicle, they could do so.  (Tr. at 17–19.)  When Special Agent Moham aired this message, he did not know whether the Englewood Police Department was on his radio

---

[1]  All citations to docketed materials are to the page number in the CM/ECF header, which sometimes differs from a document's internal pagination.

[2]  Neither party has ordered the transcript of the December 7, 2020 evidentiary hearing. Accordingly, the Court will cite the rough version of the transcript.  Pagination may differ from a final version of the transcript, to the extent it is prepared.

channel; he instead aired the message out "in general to those people that were

supporting our operation."  (Tr. at 25.)

Thereafter, Special Agent Moham and other agents entered Pappas's residence

to execute the search warrant.  (Tr. at 10.)  According to Special Agent Moham,

> We proceeded to the residence. I knocked and
> announced on the residence for about 20 seconds with no
> answer to the residence.  At that time, I called for a breach.
> The breacher came up, we breached the residence.  I
> believe I was about No. 3 in the order of people that moved
> through the residence.  We entered the residence, there was
> nobody inside.  Just a cursory search of the residence I
> noticed that there were some handgun magazines near a TV
> stand, there was a bulletproof vest there.  There was some
> gang paraphernalia that was around the residence.  At that
> time, I brought everybody else out of the residence so that
> we could take pictures before we commenced our search.

(Tr. at 10–11.)  Special Agent Moham believed that Pappas was going to be arrested

because he knew that Pappas, as a prior felon, is prohibited from owning a bulletproof

vest and handgun magazines.  (Tr. at 11.)

After exiting the residence, Special Agent Moham learned that Pappas was

detained in a traffic stop.  (Tr. at 17, 21.)  He then radioed out a request "that [Pappas]

be brought back to the scene so we can consolidate our resources and so Englewood

[Police Department officers] could go back about their patrol duties."  (Tr. at 21.)  He did

not state over the radio that he had found ammunition and a bulletproof vest during the

execution of the search warrant.  (*Id.*)  He did not testify that any specific law

enforcement individual or unit received this communication.  In fact, he specifically

denied knowledge about whether the Englewood Police Department was listening to his

radio channel.  (Tr. at 19.)

3

Englewood Police Department Officers Hume and Emily Carreno were

supporting federal agents with their execution of the search warrant of Pappas's

residence on the evening of February 5, 2020.  (Tr. at 28.)  They were informed that

Pappas had a history of weapons convictions, but they did not know why the DEA was

executing a search warrant on Pappas's residence that evening.  (Tr. at 31.)  They were

then informed that "a vehicle was leaving [Pappas's] residence and they wanted to be

able to identify the occupants."  (Tr. at 29.)  At some point while federal agents were

executing the search warrant of Pappas's residence, Officers Hume and Carreno

observed that the Toyota's driver did not signal 100 feet prior to turning, as required by

law.  (Tr. at 30.)  Officer Hume activated his emergency lights, and the Toyota pulled

over into a Conoco gas station.  (*Id.*)  Thereafter, Officer Hume approached the driver's

side of the Toyota where Pappas was seated, and Officer Carreno contacted the

passenger, Martinez.  (*Id.*)

According to Officer Carreno, the "the whole rear compartment starting from the

rear seat was packed with personal items," so she and Officer Hume asked Pappas

and Martinez to exit the Toyota based on officer safety concerns.  (Tr. at 31–32.)  After

a bit of small talk, Officer Hume informed Officer Carreno that they were taking Pappas

and Martinez into custody.  (Tr. at 45, 50.)  Officer Carreno believes that "Officer Hume

communicated that information to [her] from the federal agents that were on the scene"

at Pappa's residence.[3]  (*Id.*)  At the time they arrested Pappas, Officers Hume and

_____

[3] Officer Carreno's case report states that "[Pappas] was detained as instructed by the DEA agent in charge."  (ECF No. 105-5 at 3.)  It is unclear whether this is a reference to the DEA's suggestion that they should follow and stop Pappas's vehicle if they had probable cause to do so or DEA's instruction to bring Pappas back to the residence.  The Court notes, however, that neither Officer Carreno nor Officer Hume's case reports explicitly state that they heard a

4

Carreno seized Pappas's ID cards, car keys, and cash.  (ECF No. 82 at 2.)

Another law enforcement officer drove Pappas back to his residence.  (Tr. at 33.)

Thereafter, Officer Carreno drove the Toyota back to Pappas's residence as well.  (*Id.*)

**B.     Special Agent Wilson's Questioning of Pappas**

At some point after Pappas was arrested and brought back to his residence,

Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") Special Agent Alex

Wilson arrived at Pappas's residence.  (Tr. at 57.)  Special Agent Wilson went to speak

with Pappas, who was seated in a DEA vehicle in handcuffs.  (Tr. at 58–59.)  According

to Special Agent Wilson,

> I went and approached the DEA vehicle where Mr. Pappas
> was in the front passenger seat.  And identified myself as a
> special agent with ATF.  Advised him of the levity of the
> charges that he was facing and then I read him *Miranda*
> from an ATF form 3400.2 which is an ATF document for
> advisement of rights.

(Tr. at 58.)  Special Agent Wilson testified that Pappas "acknowledged that he

understood those rights and . . . advised that he was willing to communicate with me

without an attorney present."  (Tr. at 59.)  Thereafter, Pappas made a statement to

Special Agent Wilson.  (ECF No. 82-1.)

Pappas now seeks to suppress the statements made in response to questioning

from federal agents on February 5, 2020, as well as the items seized from Pappas

following his arrest (his identification, keys, cash, and the Toyota).  (ECF No. 82 at 4.)

---

DEA agent instruct them over the radio to arrest Pappas and/or bring him back to his residence.
(*Id.* at 2–4.)

## II.  BURDEN OF PROOF

The Fourth Amendment to the U.S. Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  However, "[t]he Amendment says nothing about suppressing evidence obtained in violation of this command.  That rule—the exclusionary rule—is a prudential doctrine created by th[e Supreme] Court to compel respect for the constitutional guaranty."  *Davis v. United States*, 564 U.S. 229, 236 (2011) (internal citations and quotation marks omitted).  Under the exclusionary rule, a defendant may move for suppression of evidence obtained in violation of the Fourth Amendment.  *Id.*

It is undisputed that the officers did not have an arrest warrant when they arrested Pappas on February 5, 2020.  On a motion to suppress evidence derived from a warrantless search and/or seizure, the defendant bears the burden of presenting a *prima facie* case that the Fourth Amendment has been "implicated," at which point the burden shifts to the Government to prove "that its warrantless actions were justified (*i.e.*, as a lawful investigatory stop, or under some other exception to the warrant requirement)."  *United States v. Carhee*, 27 F.3d 1493, 1496, nn.1–2 (10th Cir. 1994) (citing authorities).

Pappas has met the burden of demonstrating that his personal Fourth Amendment rights are implicated here.  (*See generally* ECF No. 82.)  He has therefore raised a *prima facie* case of a potential Fourth Amendment violation through a warrantless seizure and subsequent search, thus shifting the burden to the Government to justify law enforcement's actions.

### III.  ANALYSIS

**A.    Legal Standards**

      1.   <u>Probable Cause Standard</u>

An officer has probable cause to arrest "if, under the totality of the circumstances, he learned of facts and circumstances through reasonably trustworthy information that would lead a reasonable person to believe that an offense has been or is being committed by the person arrested."  *United States v. Muñoz–Nava*, 524 F.3d 1137, 1144 (10th Cir. 2008) (internal quotation marks omitted).  "Probable cause to arrest does not require facts sufficient to establish guilt, but does require more than mere suspicion."  *Id.* (internal quotation marks omitted).  Probable cause is a "fluid concept" that "deals with probabilities and depends on the totality of the circumstances."  *Maryland v. Pringle*, 540 U.S. 366, 370–71 (2003).

      2.   <u>The "Collective Knowledge" Doctrine</u>

Under the collective-knowledge doctrine, the knowledge of one officer supporting a search or seizure may be imputed to other law enforcement officers acting in conjunction with the knowledgeable officer.  *United States v. Hensley*, 469 U.S. 221, 232–33 (1985).  There are two forms of collective knowledge: horizontal and vertical collective knowledge.  *See United States v. Chavez*, 534 F.3d 1338, 1345–46 (10th Cir. 2008).

The horizontal collective knowledge doctrine applies to situations in which a "number of individual law enforcement officers have pieces of the probable cause puzzle, but no single officer possesses information sufficient for probable cause."  *Id.*

(citing *United States v. Shareef*, 100 F.3d 1491, 1503–05 (10th Cir. 1996)).  "In such situations, the court must consider whether the individual officers have communicated the information they possess individually, thereby pooling their collective knowledge to meet the probable cause threshold."  *Id.*; *Shareef*, 100 F.3d at 1503–05 (noting that horizontal collective knowledge only applies if information is shared).

The vertical collective knowledge doctrine applies when "one officer *has* probable cause and instructs another officer to act, but does not communicate the corpus of information known to the first officer that would justify the action."  *Chavez*, 534 F.3d at 1346 (emphasis in original).  For example, in *Hensley*, police officers had initiated a *Terry* stop of a defendant in reliance on a "wanted flyer."  469 U.S. at 223–24.  The Supreme Court concluded that, so long as the officers that issued the flyer had a reasonable suspicion about the person it targeted, "then reliance on that flyer or bulletin justifies a stop to check identification, to pose questions to the person, or to detain the person briefly while attempting to obtain further information."  *Id.* at 232 (internal citations omitted); *see also Chavez*, 534 F.3d at 1348 (finding DEA's knowledge of probable cause to search a vehicle for contraband could be imputed to state patrolman who was asked to make stop of vehicle, even though all of the information forming the probable cause was not communicated to the state patrolman); *United States v. Burton*, 288 F.3d 91, 99 (3d Cir. 2002) ("[T]he arresting officer need not possess an encyclopedic knowledge of the facts supporting probable cause, but can instead rely on an instruction to arrest delivered by other officers possessing probable cause.").

**B.     Analysis**

In determining whether Officers Hume and Carreno violated Pappas's Fourth

Amendment rights, the Court will consider the reasonableness of their conduct at each

stage of their February 5, 2020 encounter with Pappas.

1.     <u>Initial Stop of the Toyota</u>

The Court finds that probable cause supported Officers Hume and Carreno's

initial decision to stop the Toyota.  Once Officers Hume and Carreno observed that the

Toyota's driver failed to initiate a turn signal at least 100 feet prior to turning, they were

entitled to conduct a routine traffic stop of the vehicle to investigate that civil violation.[4]

*See Whren v. United States*, 517 U.S. 806, 809–10 (1996) ("As a general matter, the

decision to stop an automobile is reasonable where the police have probable cause to

believe that a traffic violation has occurred."); Colo. Rev. Stat. § 42-4-903(2) ("A signal

of intention to turn right or left shall be given continuously during not less than the last

one hundred feet traveled by the vehicle before turning in urban or metropolitan areas

. . . .").

Thus, Officers Hume and Carreno acted reasonably under the Fourth

Amendment when they stopped the Toyota.

2.     <u>Pappas's Arrest</u>

Pappas argues that Officers Hume and Carreno lacked probable cause to arrest

him.  (ECF No. 82.)  In response, the Government argues that there was probable

---

[4]  The Court recognizes that this traffic violation was a pretext to stop the Toyota.
Nonetheless, as the Supreme Court ruled in *Whren*, the constitutional reasonableness of traffic
stops does not depend on the actual motivations of the individual officers involved.  *Whren*, 517
U.S. at 813.

cause to arrest Pappas once Special Agent Moham observed a bulletproof vest and ammunition at Pappas's residence, and that this probable cause was imputed to Officers Hume and Carreno through the vertical collective knowledge doctrine.[5]  (ECF No. 95 at 3–4.)

The Court first considers whether Special Agent Moham, who issued an instruction to bring Pappas back to his residence, had probable cause to arrest Pappas. On this front, the Court finds that Special Agent Moham had ample probable cause. After all, Special Agent Moham observed a bulletproof vest and ammunition in plain view while executing the search warrant on Pappas's residence, and he knew that Pappas was prohibited from possessing these items based on his status as a prior felon.

The Court next considers whether Special Agent Moham's probable cause was imputed to Officers Hume and Carreno under the vertical collective knowledge doctrine, focusing on the following pieces of testimony.

First, Special Agent Moham radioed out a request "that [Pappas] be brought back to the scene."  (Tr. at 21.)  However, he did not know whether the Englewood Police Department was listening to his radio channel and instead aired out the message "in general to those people that were supporting our operation."  (Tr. at 25.)  He did not testify that anyone from the Englewood Police Department explicitly confirmed that they received his message.

_____

[5]  During the evidentiary hearing, the Government conceded that its argument that Pappas's arrest was supported by probable cause is predicated *solely* on the applicability of the vertical collective knowledge doctrine.  (Tr. at 93.)

Second, Officer Carreno testified that Officer Hume informed her that they were taking Pappas and Martinez into custody.  (Tr. at 45, 50.)  She testified that she believed that "Officer Hume communicated that information to [her] from the federal agents that were on the scene [at Pappas's residence]."  (Tr. 50.)  She did not testify that she heard the purported radio communication herself or that Officer Hume specifically informed her that they were instructed to bring Pappas back to his residence.  Moreover, Officer Hume—the officer who purportedly heard Special Agent Moham's request and acted upon this request—did not testify at the evidentiary hearing.  (Tr. at 86.)

Under the usual applications of the vertical collective knowledge doctrine, there is generally no dispute that the officer who had knowledge of the basis for probable cause actually transmitted an instruction to another officer(s), and that another officer received and acted upon this instruction.  *See, e.g.*, *Chavez*, 534 F.3d at 1341, 1345 (finding that agent's probable cause to search vehicle was imputed to a patrolman after the agent called the patrolman and asked him to stop defendant's vehicle); *United States v. Alderete*, 753 F. App'x 617, 619, 623 (10th Cir. 2018) (upholding traffic stop based on vertical collective knowledge doctrine where a DEA agent with probable cause ordered a vehicle to be stopped and an officer received the DEA agent's order and stopped the vehicle based on his instruction); *United States v. Whitley*, 680 F.3d 1227, 1230–31, 1235 (10th Cir. 2012) (finding officer's *Terry* stop of defendant's vehicle was justified under the vertical collective knowledge doctrine based on ATF agent's reasonable suspicion to believe that defendant was a felon in possession of a firearm and instruction to the officer to conduct the stop).

11

The Government asks the Court to take a leap of faith and infer from the testimony of Officer Carreno—an officer who was *not* party to the radio communication in question and thus had no personal knowledge of the contents of that communication—that Officer Hume must have heard, and acted upon, Special Agent Moham's request that officers bring Pappas back to the residence.  The Court recognizes that this is indeed one plausible inference.  Weighing against making this inference, however, is a lack of specific evidence confirming that: (1) Special Agent Moham's radio communications actually reached Officers Hume and Carreno; or (2) Officer Hume acted upon Special Agent Moham's request.  Indeed, had Officer Hume testified at the hearing, and confirmed that he did in fact receive the communication from Special Agent Moham, and acted upon it by bringing the Defendant back to his residence, the application of the vertical collective knowledge doctrine to such facts would be clear.  Presented with this hypothetical set of facts, the Court quite easily would have denied the instant Motion.

But these are not the facts before the Court.  Critically, given the uncontroverted evidence adduced at the hearing on the Motion, it is manifest that neither element of the doctrine were established here.  Special Agent Moham candidly, and refreshingly, admitted he could not state definitively whether or not Officers Hume and/or Carreno received either of his radio communications.  Officer Hume—the only individual who could have confirmed from personal knowledge receipt of this communication from the person knowing the basis for probable cause—failed to appear at the hearing to provide this critical testimony.  Without these decisive pieces of evidence, the Court cannot eliminate the alternative possibility that Officer Hume was contacted by some other law

enforcement officer who had no knowledge whatsoever of the basis for the probable cause to arrest and subsequently interrogate Pappas. The Court concludes that in order to uphold the vital constitutional protections the Fourth Amendment affords persons in Pappas' situation, it is the Government alone which must bear the adverse consequences of Officer Hume's inability or unwillingness to testify before the Court on the issues presented here.

The Court therefore finds and concludes that the Government has failed to prove that probable cause supported Officers Hume and Carreno's arrest of Pappas on February 5, 2020.[6]  Accordingly, the evidence seized as a result of his arrest (his car keys, his physical ID cards, cash, and the Toyota), as well as his post-arrest statement, must and will be suppressed.

## IV.  CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1.      Pappas's Motion to Suppress Evidence and Statement Obtained Subsequent to an Illegal Arrest (ECF No. 82) is GRANTED; and

2.      The items seized from Pappas after his arrest (his car keys, his physical ID cards, cash, and the Toyota), as well as his statements illegally obtained on February 5, 2020, are hereby SUPPRESSED.

---

[6]  Because the Court has determined that Pappas's arrest was unlawful, it need not determine whether Pappas received *Miranda* warnings prior to making his post-arrest statement.  The Government agrees that if Pappas's arrest lacked probable cause, then Pappas's post-arrest statement must also be suppressed.  (Tr. at 99.)

Dated this 7th day of January, 2021.

BY THE COURT:

William J. Martínez
United States District Judge